CHICAGO, R. I. & G. RY. CO. v. CORE.
(No. 749.)

(Court of Civil Appeals of Texas. Amarillo.
March 27, 1915. Rehearing Denied
May 1, 1915.)

1. EVIDENCE ☞474½—OPINION EVIDENCE—QUESTION OF LAW AND FACT.
In an action for injuries to live stock in shipment, testimony by the shipper as to the ordinary shrinkage of cattle under proper shipment, if they were properly handled, is not an opinion on a mixed question of law and fact, since the expressions "proper shipment" and "properly handled" do not refer to the condition of the cattle under the shipment in question, but to the usual and ordinary shrinkage of cattle of that class when shipped.
[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2220–2223; Dec. Dig. ☞474½.]

2. APPEAL AND ERROR ☞1051 — HARMLESS ERROR—ADMISSION OF EVIDENCE—FACT OTHERWISE ESTABLISHED.
Error in admitting opinion evidence as to a mixed question of law and fact is harmless, where substantially the same facts were otherwise proved without objection.
[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161–4170; Dec. Dig. ☞1051.]

3. CARRIERS ☞218 — CARRIAGE OF LIVE STOCK — LIABILITY OF CARRIER — NEGLIGENCE.
A carrier of live stock cannot, under the Hepburn Act (Act June 29, 1906, 34 Stat. 584), exempt itself by contract from liability for its negligence, or that of its servants, causing damage to an interstate shipment of live stock.
[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674–696, 927, 928, 933–949; Dec. Dig. ☞218.]

4. CARRIERS ☞218 — CARRIAGE OF LIVE STOCK — LIABILITY OF CARRIER — HIGHER RATE—OPTION OF SHIPPER.
Where a carrier had published a tariff of interstate rates on shipments of live stock, which contained two rates, a higher one for shipment at the carrier's risk, and a lower one for shipment at an agreed valuation and limitation of damages, and a shipper exercised his option by demanding the higher rate, the carrier cannot escape full liability for damages because of the fact that the agent refused to accept the shipment at the higher rate and to mark the contract accordingly, since by the exercise of the shipper's option the contract became one at the carrier's risk, regardless of the terms of the bill of lading, and the carrier could have collected the higher rate at destination.
[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674–696, 927, 928, 933–949; Dec. Dig. ☞218.]

Appeal from Wheeler County Court; M. M. Miller, Judge.

Action by J. C. Core against the Chicago, Rock Island & Gulf Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

N. H. Lassiter, of Ft. Worth (Gustavus & Jackson, of Amarillo, of counsel), for appellant. H. B. Hill and M. Reynolds, both of Shamrock, for appellee.

HUFF, C. J. J. C. Core sued the Chicago, Rock Island & Gulf Railway Company for damages alleged to have been occasioned in the shipment of two cars of cattle, 56 head, from Bennonine, Tex., to Kansas City, Mo., which were received for shipment August 23, 1913, alleging that the cattle were negligently delayed along the route; that they were in good condition when delivered to appellant; that the cattle were loaded in two cars at Bennonine; that those which were dehorned were loaded into one car, and those with horns in another car, which was done to prevent injury to themselves by hooking and fighting each other; that at Herrington, Kan., where the cattle were unloaded, fed, and watered, the appellant undertook and did reload the cattle, and reloaded the horned and dehorned cattle together in the cars and intermingled them; that the appellant did so over the protest of appellee, and over his request that they be reloaded as they were at the beginning of the voyage, and as a result they fought each other, etc., and when they reached Kansas City they were shrunken in flesh, bruised, skinned, crippled, and wounded; that by reason of the delay, and the intermingling of the cattle in the same cars, they were injured and damaged, so that they weighed only 49,940 pounds, when, if they had been handled without such negligent delay and intermingling them in the cars, they would have weighed at least 53,930 pounds, and that appellee was damaged thereby in the sum of $378.50.

The appellant answered, among other things, that the shipment was made upon a written contract, the terms of which were

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

reasonable and binding, and to the effect: (1) That the agent of the company was not authorized to agree to any specific time, or any particular market; (2) that the cattle should be loaded, watered, fed, and rested at the risk and expense of appellee; (3) that as a condition precedent to a recovery for damages for loss or injury or detention or delay in the transportation, promptly upon discovery, to give notice to some officer or agent of the company before the stock were removed from the point of shipment and before intermingled with other cattle, and in any event appellant was to be served in one day with notice after the delivery, and a failure to so comply should be a bar to a recovery for such damages; (4) that for total loss from any cause payment would be made therefor on the actual cash value at the time and place of shipment, but in no case to exceed $50 for each ox or steer, $30 for each cow, and $10 for each calf, and in case of an injury or partial loss the amount of damages claimed shall not exceed the same proportion; (5) the suit for damages should be instituted in six months from the date of the injury; (6) that the shipment was made under tariff and freight regulations filed, published, and authorized by the Interstate Commerce Commission, and under the terms of the contract the cattle were handled under regulations and limitations known as "owner's risk," rather than "carrier's risk," and were transported for a lower or reduced freight rate by virtue of such contract, which reduced rate was and is a valuable consideration therefor; (7) that the shipment was an interstate shipment; (8) that appellant was not negligent in the delay of the shipment or intermixing the cattle at Herrington, Kan.; that appellee accompanied the shipment, whose duty it was under the contract to unload the cattle, and if the cattle were reloaded at Herrington, mixed and intermingled, that it was due to appellee's negligence; (9) that, if the cattle were damaged, it was due to their "proper vice"; (10) if there was loss, it was not due from the negligence of the appellant, but from the condition of the market for said cattle.

The appellee replied, by supplemental petition, that at the time the cattle were received for shipment he demanded and offered to pay the highest rate of freight that appellant was allowed under the law to receive, and that the cattle be transported at the "carrier's risk," and that appellant accepted the cattle and charged the highest rate of freight, and received and accepted the cattle to be carried at "carrier's risk." It is also substantially alleged that the agent refused to accept the higher rate, claiming that the rate in the bill was the only rate he could accept, and refused to recognize the option of the shipper to pay the higher rate. The jury found for the appellee damages in the sum of $378, upon which finding judg-ment was rendered, and from which appellant brings this appeal.

There is no assignment calling in question the sufficiency of the evidence to support the verdict. We therefore take it that the appellant was negligent in delaying the shipment and keeping the cattle en route an unreasonable length of time, and was also negligent in reloading the cattle at Herrington, Kan., and in mixing the two cars of cattle, and that the cattle were proximately injured by reason of such negligence, and that the appellee suffered the damages awarded by the jury.

[1, 2] The first assignment of error complains at the admission of the testimony of Jake Smith, as follows:

"I am acquainted with what is the usual and necessary shrinkage on cattle of this class in making such runs as this one under proper shipment. If we had gotten there within the usual and ordinary time, these cattle, or cattle of this class, would have shrunk somewhere around 30 or 35 pounds over their full weight out of pasture, if properly handled. On account of the extra run there was 40 or 50 pounds extra shrinkage per head on these cattle."

This witness accompanied the cattle, and is shown to have been a shipper of many years' experience and qualified to give his opinion as to shrinkage of cattle. The evidence above quoted was explained by the witness as follows:

"I mean to say they shrunk 40 or 50 pounds per head more than they would have ordinarily and customarily shrunken if they had been carried in the usual and customary time."

And further:

"I mean they were damaged half a dollar on what they actually weighed, and I mean to say that there was 40 or 50 pounds shrink more per head than there would have been if the cattle had been handled in the usual manner and gotten on the market in the usual and customary time. Those cattle would have weighed 40 pounds more per head than they did weigh if they had reached Kansas City market in the usual and customary time, and had they been handled in the usual and customary manner."

The terms "proper shipment" and "properly handled," testified to by the witness, do not refer to the condition of the cattle under the shipment in question, but refer to the usual and ordinary shrinkage of all cattle of that class when shipped. His testimony amounts to the statement that the cattle shrunk from 70 to 85 pounds in this shipment and that the necessary shrinkage was 30 or 35 pounds. As the testimony was given, we do not think it was an opinion upon a mixed question of law and fact; if, however, this were true, substantially the same facts were proven without objection.

The second assignment is overruled. We do not believe the charge subject to the criticism urged in the assignment. There was no exception made in the court below that the charge did not confine the jury to the negligence pleaded by appellee; but, had the exception been urged, we do not believe the charge susceptible of the interpretation given by appellant, and, further, the jury

did not find for the appellee under this charge as shown by their verdict. They expressly find under paragraph 5 of the court's charge.

The third assignment presents the serious issue in this case: The trial court instructed the jury that the shipment was an interstate shipment, made under the tariff and freight regulations of the Interstate Commerce Commission, which provides for two distinct rates, one denominated "shipper's risk," and one "carrier's risk," and said tariff provides that shippers of live stock shall be given their option between the rates, and, further, if the jury found from the evidence that, before signing the contract of shipment, appellee demanded of the appellant's agent at the station from which the shipment originated the opportunity to pay the higher rate for the transportation, and thereby became entitled to the privilege and terms of a carrier's risk contract, and the agent refused and denied him the benefit, and refused to execute the same at said higher rate, and declined to accept the cattle unless the contract in evidence was signed by the shipper, then they were instructed the contract would be without consideration, and its terms not binding on appellee, and if they should find that he was not bound by the contract, and found the other necessary facts, to find for appellee the damages actually sustained.

The jury, by their verdict, found under the charge and so stated therein. The contract of shipment in evidence stipulates that appellant will transport for appellee the live stock, "one car [there was a bill for each of the two cars in the same terms], said to contain —— head of clean, native cattle, from Bennonine, Tex., to Kansas City, Mo., consigned to Campbell & Ross, at the rate of 29 cents per cwt., from Bennonine, Tex., to Kansas City, Mo., subject to the minimum weight and length of cars specified and provided for in tariff, said rate being less than the rate charged for shipments transported at carrier's risk, for which reduced rate and other considerations it is mutually agreed between the parties hereto as follows." Then follows the provision set out in appellant's answer, and under the seventeenth paragraph it is stated that in making the contract the owner of the stock acknowledges that he has had the option of making the shipment under the tariff rates, either at carrier's risk or upon a limited liability, and that he has selected the rate and liability named herein, and especially agrees to all the stipulations and conditions named. The evidence shows there were several separate shippers with cars in that train, and after the cattle were loaded, and before the contract was signed, Mr. Jake Smith, who was an experienced shipper, called the attention of appellee and the other shippers to the provision in the contract giving them the option

of rates. The shippers decided they wanted the higher rate, and the appellee states he wanted to ship under that rate, because he considered it cheap insurance. They selected Mr. Smith to act as spokesman for all of them, and he called the agent's attention to clause 17 of the contract and demanded the higher rate. The agent said he could not give it, for there was no such rate. "He gave us a flat rate of 29 cents per hundred to Kansas City. He said there was no other rate than that in the office, and he did not know anything about any other rate except that one, and that was the only rate under which we could ship the cattle." The train at that time was loaded and ready to start, and was standing at the depot when this conversation occurred, and the shippers were then waiting to sign up the contract. This witness is corroborated by two other witnesses, and in fact is not contradicted by any other.

The appellant relies alone upon the terms of the contract as drawn. Mr. P. B. O'Brien, the chief clerk of the general agent of appellant, on the witness stand identified the tariff sheet filed by appellant with the Interstate Commerce Commission, and which was in effect at the time of the shipment. The tariff sheet is not in this record. This witness testified:

"There are two rates provided for live stock in this tariff. One is what was called the 'lower rate,' or what is called the 'released rate,' and the other is the rate that did not limit the liability of the transportation company. The released rate is 20 per cent. less than the higher rate that is provided for here in the tariff."

On cross-examination the witness testified:

"The cost under the lower rate to ship a car of cattle from Bennonine to Kansas City would be 29 cents per hundred; under the higher rate it would be 20 per cent. more than that, or $34.80, and when the cattle are shipped under the higher rate the shipper signs the same contract, but it does not limit the liability of the company in regard to adjusting claims. The contract is signed in the same way under the higher rate, but it is stamped with a rubber stamp showing the cattle are shipped without limitation; that is ordinarily made on the liability of the company."

He further testified he did not know the custom of receiving cattle at Bennonine, but he did know the agent had on file both rates, and that he had no authority to dictate to the shipper the rate he should pay; that the Interstate Commerce Commission provided that railroads should charge either one of the rates, and let the shipper have the choice of which one he will pay.

The appellant presents propositions: (1) That the contract is binding, regardless of the fact that the agent may have mistakenly asserted there was only one rate, and only a contract for a carrier's limited liability would be issued; (2) that a shipper is presumed to have knowledge of the tariff, and the rights of the parties will not be affected by the misrepresentations of the agent as to the provisions of the tariff but the tariff will be strictly enforced; (3) to set aside the pro-

visions of the contract upon payment of the lower rate would be a discrimination against other shippers.

[3] The appellant does not show by its brief or contend that there was no notice of damage given to appellant under the contract, or that the suit was not instituted within six months, or contend that it was not negligent in the shipment of the cattle, or in mixing them at Herrington, as alleged, or that there was no unreasonable delay; hence we must presume, under the strict letter of the contract, the appellant would be liable, and that the appellee has not, by failure to perform the conditions imposed upon him, forfeited his right of recovery. We do not understand, from the various decisions of the Supreme Court of the United States, that a common carrier can, under the Hepburn Act, exempt itself from its own negligence or that of its servants or agents. "The liability imposed by the statute is the liability imposed by the common law upon the common carrier, and may be limited or qualified by special contract with the shipper, provided the limitation or qualification be just and reasonable, and does not exempt from loss or responsibility due to negligence." Railway Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 690. It follows, therefore, if the appellant was negligent in the particulars alleged, and if notice was given, as stipulated for in the contract, and suit was brought within the time prescribed thereby, the question presented by the court in its charge to the jury to find whether the contract was at the shipper's or carrier's risk is purely academic, and can have no practical bearing upon the result of the case. Whatever they may have found on that question would nevertheless have entitled appellee to judgment.

The only other question in the case is whether, under the contract limiting the amount of recovery to the damages for injury to the cattle in proportion to their agreed value, the assignment and propositions present such error as will reverse the case. We find no error assigned in the brief of appellant, either by assignment, proposition, or statement, that appellee's damages would have been less than the amount he actually did recover, had the rule of proportion been applied under the agreement. Railway Co. v. Vasbinder, 172 S. W. 763. The exceptions to the charge given are not that it gives an erroneous measure of damages.

The fourth and fifth assignments do not present error on the ground that the charge gave the measure of damages based upon the difference in the market value in the condition the cattle arrived at market and their value in the condition in which they should have arrived, instead of instructing that the damages should be based upon the measure stipulated for in the agreement. The error, if error, to our mind, is not presented in such way as now required under our statute with reference to exceptions and assignments, which will enable us to say there was error, properly excepted to in the court below, which should reverse the case.

[4] We have, however, reached the conclusion that, should the assignment be sufficient to present the questions involved in such way as to call on us to pass upon it, the court did not commit such error in charging the jury as will require a reversal. Conceding that the law charges the shipper with notice of the freight rate, whether he knew it or not, it will not affect the status of the parties in this case. The only testimony in the record is that the option was with the shipper to select the rate. The evidence is undisputed in this case that he did so. The agent denied him that right, or what was tantamount to a denial that there was any other rate than that given in the bill, thereby refusing to recognize appellee's option, and forced upon him a contract without stamping on the bill, "At carrier's risk." Had the rate been paid, the bill would have still appeared to evidence an agreement as to the value of the cattle and the damages which the shipper should recover.

In the case of Atchison, etc., v. Robinson, 233 U. S. 173, 34 Sup. Ct. 556, 58 L. Ed. 901, the regulation in the tariff set out therein is substantially that proven in this case; that is, that the shipper had the choice of accepting contracts of shipment with or without limitation of liability and rates accordingly. The court there said:

"We regard these cases as settling the proposition that the shipper, as well as the carrier, is bound to take notice of the filed tariff rates, and that so long as they remain operative they are conclusive as to the rights of the parties."

In the case of Boston, etc., v. Hooker, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, it is said:

"She [the shipper in that case] might have made no valuation of her baggage, in which event the rate and the corresponding liability would have automatically attached."

Again it is said:

"The effect of the filing gives the regulation as to baggage the force of a contract determining 'baggage liability.'"

In this case there is no pretense that appellee actually valued his cattle as set out in the bill of lading; that it was arbitrarily so valued by the company there can be no question, but because it had filed two rates, and then refused to accept the higher, it is claimed under the authorities, such as Railway Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 690, and many others, that appellee is estopped to show the actual value or his actual damages. If its rate when filed is binding on the shipper, it is also binding on the carrier, and when it gives the option to the shipper as to which rate he will pay, and the shipper elects to pay the higher rate, then automatically, as we understand, this defeats a fictitious contract as to value based on the lower rate. The filing of the regulation gives it the effect of a con-

tract, and we apprehend the contract is as binding on the carrier as on the shipper. We think in this case estoppel operates against the carrier, and not the shipper. When it is said to the shipper he should have the option to pay the higher rate, and he exercised that option, it cannot refuse to recognize the right after having pledged itself to the public and the government that it would recognize it. The fact that the contract was signed in this case with a value so fixed will not, as we understand it, estop appellee, especially when appellant had no other printed contract than that, either for the higher or lower rate. The contract is the same in each instance. The tariff rate is incorporated automatically into the contract by the election to pay the higher rate. The fact that the money was not actually paid will not, we think, estop the appellee. He had no way while his cattle were on the track of forcing the company to take it. It cannot, we think, make its failure to accept the freight a ground to defeat its liability under its published higher tariff rate and its contract to accept the rate. It should not be permitted to urge a forfeiture clause upon its own wrong. It certainly ought to be estopped from saying it did not know the value of the animals, and relied upon the statement in the contract of value when the appellee was insisting upon paying on a higher valuation, and was making such offer under the appellant's express published agreement that he should have the right to so elect. The appellant had an effectual method of collecting its freight rate; it was not required to deliver the freight until it received its lawful rate as agreed upon. Texas, etc., v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011.

The carrier is not liable to damages for misquoting a rate less than the full published rate. Ill. Ry. Co. v. Henderson, etc., 226 U. S. 441, 33 Sup. Ct. 176, 57 L. Ed. 290. But we see no reason why it should not be held liable under its contract for full damages, when it makes the rates part of the contract and gave the shipper the option of accepting. Its agent knew, or should have known, of the rate. All he had to do in this instance to make the contract entirely different was to use a rubber stamp on the bill, "At carrier's risk." The refusal of the agent in this instance was the act of appellant. His act in failing to place the rubber stamp on the bill amounted to a false billing. It was no part of appellee's duty to so place it. His right was to exercise the option, which he did. It was the railroad's duty, under the act of Congress, to issue the receipt on the tariff accepted; if it did not do so, it was guilty of false billing.

"If no value is stated, the tariff rate applicable to such a state of facts applies. If, on the other hand, there are alternative rates based on value, and the shipper names a value to secure the lower rate, the carrier, in the absence of something to show rebating or false billing, is

entitled to collect the rate which applies to goods of that class, and, if sued for their loss, it is liable only for the loss of which shipper has declared them to be in class and value." Great Northern Railroad v. O'Conner, 232 U. S. 508, 34 Sup. Ct. 380, 58 L. Ed. 703.

In this case it is clear from the testimony that appellee did not accept the rate named in the bill or the valuation on his cattle. He offered the higher rate, which appellant refused, and issued a false bill. It was the agent's duty, when the higher rate was selected by the shipper, to stamp on the bill with the rubber stamp, "At carrier's risk." This he did not do. We do not think any more sacredness should be attached to a railway bill of lading than any other contract. It is the railway's duty to give the instrument. In this case it had prepared a printed form, the same for both rates, and made its published rates part of the contract, dependent on the option of the shipper. It is a rule in all contracts of this kind, where one party is given an option to make a binding contract and he exercises the option, he may then enforce the contract so made. The contract as made cannot be defeated by the other party refusing to recognize the option it had theretofore given. Courts will enforce agreements when it is shown the option has been exercised. The railroad in this case may collect the difference in the rate, and doubtless has its remedy therefor. The fact that the shipper signed the contract giving the value will not affect the case, as we understand, under that line of cases which hold that it is the rate, which is part of the contract, that is to be looked to for the value upon which payment is to be made.

The fourth and fifth assignments are overruled. We do not believe the charge of the court is amenable to the objections made. If the charges are otherwise not verbally accurate, exceptions were not presented calling attention to such inaccuracies.

The case will be affirmed.